### UNITED STATES STEEL MINING COMPANY, LLC, Petitioner

v.

### WORKERS' COMPENSATION APPEAL BOARD (SULLIVAN), Respondent.

Commonwealth Court of Pennsylvania.

Submitted on Briefs July 30, 2004.

Decided Oct. 7, 2004.

Gerald R. O'Brien, Jr., Pittsburgh, for petitioner.

Anthony J. Kovach, Uniontown, for respondent.

BEFORE: SMITH–RIBNER, Judge, and SIMPSON, Judge, and MIRARCHI, Senior Judge.

OPINION BY Senior Judge MIRARCHI.

United States Steel Mining Company, LLC (Employer) petitions this Court for review of an order of the Workers' Compensation Appeal Board (Board) affirming a decision of a workers' compensation judge (WCJ) that granted the fatal claim

petition of Nancy Sullivan (Claimant) for the work-related death of her husband Thomas Sullivan, Jr. (Decedent). We affirm.

In a 1985 workers' compensation decision, it was determined that Decedent, then living, established that he became partially disabled as a result of contracting an occupational disease, namely anthracosilicosis, while in the employ of Employer. This decision further established that Decedent was employed as a coal miner in Pennsylvania from 1946 to 1958 and from 1965 to 1983. He was employed by Employer from 1965 until 1983, and became partially disabled from his occupational disease in 1984. During his employment as a coal miner, Decedent was exposed to the hazards of coal and silica dust, and his occupational disease resulted from his cumulative exposure to these hazards. Decedent died in 2000, and at Claimant's request, an autopsy was performed on Decedent, resulting in, among other things, a series of slides of Decedent's lung tissue.

At the hearing on her fatal claim petition, Claimant presented the deposition testimony of Cyril H. Wecht, M.D. and Curtis S. Goldblatt, M.D. Dr. Wecht, a board-certified anatomic, clinical, and forensic pathologist, testified that he reviewed Decedent's medical records, his occupational history, the autopsy report, and the slides made from tissue taken from the cadaver. Dr. Wecht concluded that Decedent suffered from a cancerous tumor with multiple metastases in the liver, lung, lymph nodes, omentum, and mesentery. He also suffered from a tumor-related obstruction of the common bowl duct and an inflammation of the abdominal cavity. Further, the Decedent had an enlarged heart with hardening of the arteries and the aorta. Additionally, he suffered from anthracosilicosis or coal workers' pneumoconiosis, and severe bilateral fibroscleritis.

Dr. Wecht also testified that Decedent suffered from a heart and lung condition known as cor pulmonale.

Dr. Wecht opined that Decedent's principal cause of death was his widespread cancer, but that Decedent's coal workers' pneumoconiosis, as a secondary disease process, was a substantial contributing factor to his death. He explained that the 50% increase in the thickness of the right side of Decedent's heart, compared with a more modest increase in the thickness of the left side of the heart, indicated that these changes were caused by Decedent's lung disease, not by his hypertension or arteriosclerosis. He further described Decedent's lung disease as an additional burden upon his cardiovascular problems, one that "made the physiological burden for the cardiopulmonary cycle a greater one for the body to sustain." Deposition of Dr. Wecht, p. 24. For these reasons, Dr. Wecht opined that Decedent's pneumoconiosis was a significant contributing cause of Decedent's death.

On cross-examination, Dr. Wecht acknowledged that Decedent had a history of heavy cigarette smoking, the effects of which on their own could develop chronic obstructive pulmonary disease. Dr. Wecht noted, however, that cigarette smoking could not cause Decedent's pulmonary fibrosis and the other conditions associated with the deposit of silicate crystals in his tissue.

Dr. Goldblatt, who is board-certified in the specialty of anatomic and clinical pathology, testified that he reviewed the autopsy slides of Decedent's tissue, the various relevant medical records and reports, and Decedent's occupational history. Dr. Goldblatt observed on the autopsy slides macules of coal workers' pneumoconiosis ranging in size from less than .1 centimeter to .8 centimeters within the lymph nodes. Dr. Goldblatt testified that from

his review of the slides of Decedent's lung tissue, he was able to diagnose Decedent as suffering from simple coal workers' pneumoconiosis, severe pulmonary emphysema, and metastatic endocarcinoma. Dr. Goldblatt further testified that the medical records and autopsy report, as well as the autopsy material, indicated that Decedent also suffered from widespread metastatic colon cancer, severe coronary artery disease, myocardial fibrosis, and an enlarged heart with thickening of the left and right ventricles. Because the right ventricle was markedly thicker than the left ventricle, Dr. Goldblatt opined that Decedent also suffered from cor pulmonale.

Dr. Goldblatt opined that Decedent's death was caused by cardiac failure precipitated by the numerous disease processes that were occurring within him. Dr. Goldblatt further opined that coal workers' pneumoconiosis, as a major component of Decedent's lung disease, was a significant contributing factor in Decedent's death. Dr. Goldblatt described Decedent's lung disease as simple coal workers' pneumoconiosis and severe pulmonary emphysema, which was in part caused by the simple coal workers' pneumoconiosis. The lung disease decreased the oxygen supply to the heart, and the right ventricular hypertrophy, also related to Decedent's coal workers' pneumoconiosis, caused a demand for additional oxygen to serve the larger muscle mass. Thus, according to Dr. Goldblatt, these conditions, both related to Decedent's coal workers' pneumoconiosis, caused the heart to fail.

Dr. Goldblatt described Decedent's coal workers' pneumoconiosis as a secondary cause of death, which on its own would not have caused his death. In combination with Decedent's other disease processes, however, the coal workers' pneumoconiosis had a significant role to play in Decedent's demise. Dr. Goldblatt was aware of Decedent's history of smoking.

Employer presented the deposition testimony of Stephen T. Bush, M.D. and Everett F. Oesterling, Jr., M.D. Dr. Bush, who is board-certified in the specialty of anatomic and clinical pathology, testified that he reviewed the autopsy slides of Decedent's tissue, various medical records and reports, and Decedent's occupational history. Dr. Bush opined that the autopsy slides did not reveal any evidence of coal workers' pneumoconiosis, and that the black pigment evident, absent a scarring, was not an indicator of coal workers' pneumoconiosis but of metastatic carcinoma. He further opined that Decedent's lung disease consisted only of a mild-to-moderate centrilobar emphysema, attributable to his cigarette smoking but not to coal dust. Dr. Bush also opined that Decedent's cause of death was his metastatic colon cancer. Dr. Bush did not believe that Decedent's heart disease contributed to his death; nor did he believe that coal workers' pneumoconiosis was a factor either. In fact, he denied that Decedent ever suffered from coal workers' pneumoconiosis. Dr. Bush further testified that he did not believe that Decedent suffered from cor pulmonale, and that the bi-ventricular hypertrophy was caused by chronic hypertension, not lung disease.

Dr. Oesterling, who is board-certified in the specialty of anatomic and clinical pathology and nuclear medicine, testified that he reviewed the autopsy slides of Decedent's tissue, various medical records and reports, and Decedent's occupational history. Dr. Oesterling noted that the black pigment found around the pulmonary vessels did contain birefringement silica crystals, or coal mine dust. He opined, however, that Decedent had only a relatively mild form of pulmonary anthracosis. Dr. Oesterling also believed that

Decedent suffered from centrilobular pulmonary emphysema, which he attributed to Decedent's smoking, not to the inhalation of coal dust. Dr. Oesterling opined that Decedent died primarily from his extensive metastatic edema carcinoma, which affected 25% of the lung and 75% of the liver. Dr. Oesterling identified arteriosclerosis, causing both cardiac and renal damage, as the secondary cause of death. He did not believe that coal workers' pneumoconiosis or exposure to coal dust played any role in Decedent's death, and he opined that Decedent did not suffer from cor pulmonale.

The WCJ found the testimony of Drs. Bush and Oesterling to be credible and persuasive, and he rejected the testimony of Drs. Wecht and Goldblatt to the extent that they contradicted the opinions of Drs. Bush and Oesterling. Based on these credibility determinations, the WCJ found that neither coal workers' pneumoconiosis nor Decedent's exposure to coal dust caused, significantly contributed to, or accelerated, Decedent's death. In making this determination, the WCJ noted the significant organ destruction caused by Decedent's cancer and heart disease, and stated that "neither Dr. Goldblatt or Dr. Wecht have set forth in any persuasive manner a mechanism of death by which coal workers' pneumoconiosis would play a significant role in this situation." WCJ's Decision dated January 4, 2002, Finding of Fact No. 9. The WCJ accordingly denied Claimant's fatal claim petition.

The Board reversed and remanded on the grounds that the medical opinions of Drs. Bush and Oesterling were incompetent as a matter of law pursuant to *Hebden v. Workmen's Compensation Appeal Board (Bethenergy Mines, Inc.)*, 534 Pa. 327, 632 A.2d 1302 (1993), and *GA & FC Wagman v. Workers' Compensation Appeal Board (Aucker)*, 785 A.2d 1087 (Pa. Cmwlth.2001). The Board determined that both doctors denied that Decedent suffered from a disabling coal workers' pneumoconiosis, yet in a 1985 referee decision, Decedent was found to suffer from a work-related disabling anthracosilicosis. The Board noted that "anthracosilicosis" and "coal workers' pneumoconiosis" are interchangeable terms and that this disease is non-reversible. *See Bethenergy Mines, Inc. v. Workmen's Compensation Appeal Board (Skirpan)*, 531 Pa. 287, 612 A.2d 434 (1992). Thus, the Board determined that, pursuant to *Hebden* and *GA & FC Wagman*, medical testimony that denies the existence of a disabling condition already established through the workers' compensation process is incompetent as a matter of law. The Board accordingly remanded to the WCJ for further findings of fact based on competent evidence of record.

On remand, the WCJ found that a work-related coal workers' pneumoconiosis was a substantial contributing cause of Decedent's death, based upon the testimony, now found credible, of Drs. Wecht and Goldblatt, and accordingly granted Claimant's fatal claim petition. The Board affirmed, and this petition for review followed.[1]

1. This Court's scope of review in workers' compensation cases is limited to determining whether violations of constitutional rights or errors of law were committed, or whether the WCJ's findings of fact are adequately supported by substantial, competent evidence. *Lehigh County Vo–Tech School v. Workmen's Compensation Appeal Board*

*(Wolfe)*, 539 Pa. 322, 652 A.2d 797 (1995). Also, the "capricious disregard" of evidence standard of review is now a component of appellate consideration in every administrative agency adjudication where the question is properly brought before the Court. *Leon E. Wintermyer, Inc. v. Workers' Compensation Appeal Board (Marlowe)*, 571 Pa. 189, 812

Employer raises the following issues for review: (1) whether the Board erred by vacating and remanding the WCJ's initial decision with instructions to find the opinions of Employer's medical expert witnesses incompetent as a matter of law; (2) whether the "Board err[ed] by affirming [the WCJ's] decision, as amended, which ruled that [Employer's] medical experts were incompetent"; (3) whether the WCJ's second decision is well-reasoned or supported by substantial evidence; and (4) whether the Board and the WCJ erred by applying the legal rationale of *Hebden* and *GA & FC Wagman*, and related cases to the facts of the present case. Employer's Brief, p. 4.

## I.

■ First, Employer argues that even if the testimony of its medical witnesses was incompetent, Claimant nevertheless failed to meet her burden on the fatal claim petition because the WCJ found her medical witnesses not credible or persuasive. Employer relies upon *Stalworth v. Workers' Compensation Appeal Board (County of Delaware)*, 815 A.2d 23 (Pa.Cmwlth. 2002), *petition for allowance of appeal denied*, 576 Pa. 717, 839 A.2d 355 (2003), which held that even if the testimony of an employer's medical witness is determined to be not competent, the claimant still bears the burden of proving a fatal claim petition with credible evidence of his or her own.

In *Stalworth*, the decedent committed suicide following a period of depression that occurred after he sustained a disabling work-related physical injury. In opposition to the fatal claim petition, the employer presented the testimony of Dr. Rieger, who apparently did not possess all

A.2d 478 (2002). Employer has not raised a capricious disregard of evidence issue in this case.

relevant information when he opined that the decedent's suicide was not related to the work injury but to non-work-related schizophrenia. The claimant presented the testimony of Dr. Romirowsky, a psychologist who had treated the decedent three years prior to the suicide, at which point the decedent showed no suicidal behavior. Although Dr. Romirowsky opined that the work injury was a substantial contributing cause of the suicide, he further testified that because he had not seen the decedent for three years prior to the suicide, he could only *speculate* as to how the decedent reached the point of committing suicide. The WCJ rejected Dr. Romirowsky's testimony as not convincing, and the Board affirmed the WCJ's denial of the fatal claim petition.

We affirmed, holding that even if Dr. Rieger's testimony was not competent as a matter of law because he had failed to review all of the available and relevant medical information, the claimant nevertheless failed to sustain her burden on the fatal claim petition because her medical witness was found to be not credible. Although noting that credibility determinations reside with the WCJ, we emphasized the fact that the claimant's witness admitted that he could only speculate as to the cause or causes of the suicide because of his unfamiliarity with the decedent's condition for three years prior to the suicide. We concluded: "Thus, even disregarding Dr. Rieger's testimony, the WCJ had sufficient reason to conclude that Claimant failed to sustain her burden of proof because Claimant failed to produce any credible medical evidence to connect the work injury ... to Decedent's death." *Id.* at 30.

Here, Employer argues that we should reach a similar result. Employer contends that the Board erred by failing to affirm the WCJ's first decision because, even if the Board removed from the record the testimony of Employer's witnesses as not competent, the WCJ found that Claimant's medical witnesses were not credible or convincing, and therefore Claimant failed to carry her burden of proof.

Employer draws too sweeping a conclusion from *Stalworth*, however. For one, the facts of *Stalworth* are vastly different than those of the present case. Dr. Romirowsky's essential medical diagnosis in *Stalworth* was found not credible by the WCJ because it was admittedly based on speculation and thus the Board had clear grounds to affirm the WCJ's conclusion that the claimant had not met her burden of proof, even in the face of the disqualification of the employer's conflicting medical evidence. In the case before us, however, the testimony of Drs. Wecht and Goldblatt was not based on speculation. Rather, as did Drs. Bush and Oesterling, Drs. Wecht and Goldblatt plainly identified the current autopsy and other medical evidence and the processes by which they arrived at their medical opinions concerning the causes of death.

Further, and more importantly, the WCJ rejected the testimony of Drs. Wecht and Goldblatt *only* to the extent that such testimony contradicted that of Drs. Bush and Oesterling. WCJ's Decision, January 4, 2002, Finding of Fact No. 9. Thus, the WCJ's reliance upon incompetent medical evidence plainly could not be severed from the WCJ's credibility determination of

Claimant's evidence. This conclusion is highlighted by the fact that Dr. Oesterling testified that if Decedent had a significant coal workers' pneumoconiosis, then this disease *would have been a contributing factor in Decedent's death*. Dr. Oesterling's Deposition, p. 26.[2] Further, the WCJ's initial decision indicates or suggests that had he not relied upon Employer's incompetent evidence, he may have made a different credibility determination on evidence that was rejected *only to the extent* that it contradicted the incompetent evidence. In fact, the WCJ did make a different credibility finding after reviewing the evidence not disqualified. Therefore, having rendered void the critical testimony of Drs. Bush and Oesterling on grounds of incompetency, it plainly followed that the Board should remand the case to the WCJ in order to re-evaluate the competent testimony of record. In other words, the WCJ's reliance upon the incompetent testimony of Drs. Bush and Oesterling was not, as Employer asserts, "harmless error."

Moreover, we note that the adoption of Employer's argument would lead to an absurd result. Taking Employer's argument to its essential conclusion, it would become error to even consider the issue of whether the medical evidence of the non-burdened party was competent, because in all instances where the WCJ relies upon incompetent evidence of the non-burdened party, he or she would also find not credible or persuasive competent testimony of the medical witness of the burdened party. Thus, Employer would have us write into the Workers' Compensation Act (Act)[3] a bizarre system whereby the non-burdened

---

2. Of course, it had already been established that Decedent's coal workers' pneumoconiosis was significant enough to render him disabled from ever again working as a coal miner. Therefore, it would appear that Dr. Oesterling's testimony on its own is sufficient to support the WCJ's ultimate conclusion that Claimant had proved her fatal claim petition.

3. Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. §§ 1–1041.4; 2501–2626.

party may present its case with evidence that is not legally competent, and yet the WCJ may rely upon such non-competent evidence in rejecting the competent evidence presented by the burdened party. This result is contrary to the requirement of Section 422(a) of the Act, 77 P.S. § 834(a), that "all findings of fact shall be based upon sufficient competent evidence to justify same." Further, we have determined that whether the burden of proof lies with the party seeking relief or the party opposing relief, medical evidence cannot contradict admitted facts or be used to relitigate the fact of a claimant's work-related ·injury and disability. *See, e.g., City of Butler v. Workers' Compensation Appeal Board (Botsis)*, 708 A.2d 1306 (Pa.Cmwlth.1998) (to the extent the testimony of the employer's medical witness contradicted admitted facts of a work-related disability, such testimony was not competent and could not support the employer's opposition to the claimant's *claim* petition). Therefore, Employer's argument is not tenable.

## II.

■ Employer next argues that the Board erred by determining that the testimony of Drs. Bush and Oesterling was not competent on the grounds that they denied that Claimant suffered from coal workers' pneumoconiosis. Employer contends that Dr. Oesterling did admit to some coal dust-related disease and that therefore the issue of whether he actually denied that Decedent suffered from coal workers' pneumoconiosis is one of fact that should have been resolved by the WCJ on remand. It is well established, however, the issue of the competency of a medical witness' testimony is one of law, not fact. *Terek v. Workmen's Compensation Appeal Board (Somerset Welding & Steel, Inc.)*, 542 Pa. 453, 668 A.2d 131 (1995) (issue of whether a physician's testimony is un-

equivocal is one of law subject to plenary review, rather than one of fact); *Stalworth* (this Court should evaluate under legal standards the competency of testimony in a workers' compensation petition for review).

Here, Dr. Oesterling testified, contrary to the 1985 findings by the workers' compensation referee, that while Decedent had anthracosis related to coalmine dust exposure, he did not have coal workers' pneumoconiosis. Deposition of Dr. Oesterling, p. 22. Moreover, Dr. Oesterling testified that Decedent's · anthracosis was "not a significant disease process." *Id.* Dr. Bush testified that Decedent did not suffer from coal workers' pneumoconiosis or any other disease process related to exposure to coal dust. Deposition of Dr. Bush, pp. 15, 18, and 33–34. Therefore, the Board did not err by concluding as a matter of law that Employer's medical witnesses impermissibly failed to accept the established finding by the workers' compensation referee that Decedent suffered from a disabling coal workers' pneumoconiosis.

Employer next argues that the WCJ failed to issue a reasoned second decision wherein he determined that coal workers' pneumoconiosis was a substantial contributing cause of Decedent's death. Employer argues that because the WCJ accepted the legal conclusion of the Board that the testimony of Drs. Bush and Oesterling was not competent, rather than making a factual inquiry as to whether these physicians actually denied that Decedent suffered from coal workers' pneumoconiosis, the WCJ failed to issue a reasoned decision. This argument is specious, however, as the issue Employer raises is whether the determination of the competency of medical evidence is one of law or one ·of fact. In other words, Employer is simply approaching its previously-raised issue by another

route, based on the tenuous charge that the WCJ's decision was not reasoned. As we stated, the issue of the competency of evidence is one of law, not fact. The WCJ therefore did not err by basing his second decision on the legal conclusions of the Board's remand order.[4]

## III.

Employer next argues that the Board erred by reversing the first WCJ decision on the principles set forth in *Hebden* and *GA & FC Wagman.* Employer contends that the principles of res judicata and collateral estoppel, articulated in those cases is inapplicable, because the issue of Decedent's initial workers' compensation proceeding—whether he suffered from a disabling occupational disease—is different from the issue of Claimant's present fatal claim petition—whether Decedent's occupational disease was a substantial contributing factor in his death. Employer argues that the more appropriate legal principle governing this case is to found in *Udvari v. Workmen's Compensation Appeal Board (USAir, Inc.),* 550 Pa. 319, 705 A.2d 1290 (1997), and related cases. In *Udvari,* the Supreme Court held that an employer's burden on a *termination* petition is met when it presents credible medical evidence that the claimant has fully recovered from the work injury, can return to work without restriction, and exhibits no objective medical findings relative to the work injury even in the face of the claimant's subjective claims of continued pain. Employer contends that this Court "refined" the holding of *Udvari* by allegedly holding in *Jones v. Workers' Compensation Appeal Board (Pennsylva-*

*nia Power & Light),* 735 A.2d 185 (Pa. Cmwlth.1999), that it is "immaterial" that the employer's medical expert on a termination petition did not believe that the claimant suffered a work-related injury so long as the expert presented credible testimony that the claimant was not suffering from an injury and thus not disabled at the time of the examination. Employer's Brief, p. 20. Employer also argues that the Supreme Court significantly narrowed the holding of *Hebden* in *City of Philadelphia v. Workers' Compensation Appeal Board (Szparagowski),* 574 Pa. 372, 831 A.2d 577 (2003), so as to make it inapplicable to the present case.

Employer, however, misapprehends the Board's decision to reverse the WCJ's first determination, and further draws inapposite analogies from the cases it cites. First, it is clear that the Board did not relieve Claimant of her burden of proof on the fatal claim petition, nor did the Board treat the issues on Claimant's petition as having already been decided in a prior proceeding. Rather, the Board quite correctly determined that pursuant to *Hebden* and *GA & FC Wagman,* Employer, in presenting its evidence, could not deny the existence of a non-reversible occupational disease that had already been established.

In *Hebden,* the employee, a coal miner of thirty years, had been awarded partial disability benefits after contracting coal workers' pneumoconiosis. The employer thereafter filed a termination petition, presenting the testimony of two doctors who opined that the employee never actually had coal workers' pneumoconiosis, but at most had a mild non-work-related respiratory impairment. The Court noted that

---

4. Employer also contends that "at least one of" its medical witnesses acknowledged that Claimant suffered from coal workers' pneumoconiosis. Employer's Brief, p. 17. Employer does not identify any evidence support-

ing this contention, and the record clearly indicates that Employer's witnesses rejected the determination that Claimant suffered from coal workers' pneumoconiosis.

coal workers' pneumoconiosis is a non-reversible disease and that attempts to re-examine the "condition" of an employee who suffers from this disease on subsequent petitions are "merely ... disguised attempt[s] to relitigate what has already been settled." *Id.* at 331, 632 A.2d at 1304. Thus, in *Hebden,* the Court determined that the testimony of the employer's medical witnesses that the employee did not suffer from coal workers' pneumoconiosis was "in effect, an opening of the original, unappealed determination that [he] suffered from work-related pneumoconiosis and, thus, constituted impermissible relitigation." *Id.* at 329, 632 A.2d at 1303.[5]

Here, Drs. Bush and Oesterling testified that Decedent never suffered from coal workers' pneumoconiosis, despite the earlier workers' compensation decision establishing that he had contracted this non-reversible disease. While we are mindful of the differences between a termination petition and a fatal claim petition, especially regarding the relative burdens of proof, the principle that the existence of an established non-reversible occupational disease may not be relitigated at a hearing on a termination petition, but may be relitigated at a hearing on a fatal claim petition is simply not supportable. The denial by Drs. Bush and Oesterling that Decedent ever suffered from coal workers' pneumoconiosis is, in accordance with the Supreme Court's determination in *Hebden,* effec-

tively an opening of the original, unappealed determination that Decedent suffered from work-related pneumoconiosis and is, therefore, an impermissible relitigation of the issue. Although the burden is on Claimant to prove her fatal claim petition, her burden is met when she establishes that *an already established occupational disease* made a significant contribution to Decedent's death. Claimant is not also required to prove once again that Decedent actually had an occupational disease. In this regard, it is important to recognize that a fatal claim is regarded as a *continuation* of the original claim. *Sporio v. Workmen's Compensation Appeal Board (Songer Construction),* 553 Pa. 44, 717 A.2d 525 (1998).[6] The connection between the original claim and the fatal claim in the present case is underscored by the fact that Dr. Oesterling testified that had he believed that Decedent suffered from coal workers' pneumoconiosis, he would have opined that the disease contributed to his death. (Again, this testimony by Dr. Oesterling, found credible by the WCJ in the first decision, may alone support the grant of Claimant's fatal claim petition even absent Claimant's evidence.) Therefore, the Board did not err by concluding that the testimony of Drs. Bush and Oesterling, to the extent that they denied that Decedent suffered from coal workers' pneumoconiosis, impermissibly relitigated the issue of Decedent's established condition and thus

---

5. In *GA & FC Wagman,* we held that a physician's testimony could not support a termination of workers' compensation benefits when such testimony was inconsistent with the description of the work injury set forth in the notice of compensation payable.

6. Employer also incorrectly argues that the Board cited *Sporio* for the proposition that a prior determination of occupational disease not only binds the parties to the fact of that disease, but also binds the parties to accept

that the occupational disease was a contributing factor in the employee's subsequent death. The Board did not reach this conclusion; rather, it remanded the case to the WCJ to determine whether the remaining competent evidence supported Claimant's claim that Decedent's death was caused, at least in significant part, by the occupational disease. Thus, contrary to Employer's assertions, the Board never relieved Claimant of her burden of proof.

was not competent to support the denial of the fatal claim petition.

We should also note that Employer's reliance upon *Udvari* and related termination petition cases is flawed to the extent that on a termination petition, the employer must show a change of condition. *Hebden*. As the Court in *Hebden* pointed out, coal workers' pneumoconiosis is a non-reversible disease, and therefore does not change. Employer also misconstrues our holding in *Jones*, which was also a termination petition case. We did not hold in that case that it was "immaterial" that a testifying physician did not believe that the claimant suffered from a work-related injury so long as the doctor presented credible testimony that the claimant was not suffering from an injury and thus not disabled at the time of the examination. Rather, in *Jones* we noted the salient fact that the testifying doctor did not base his opinion upon the assumption or belief that the claimant never received a work back injury, but upon his physical examination of the claimant that revealed that the claimant was capable of performing his pre-injury job and that there were no objective findings establishing the presence of a work-related back injury. By contrast, in the present case, Dr. Oesterling's opinion would have clearly shifted had he accepted the established fact of Decedent's coal workers' pneumoconiosis. It is therefore not "immaterial" that Drs. Bush and Oesterling denied that Decedent suffered from coal workers' pneumoconiosis.

Employer also argues that *Hebden* was rendered inapplicable in the present situation by the Supreme Court's later holding in *City of Philadelphia*. In *City of Philadelphia*, however, the Court merely determined that the holding in *Hebden* does not prevent an employer from presenting evidence on a suspension or modification peti-

tion that an employee who suffers from an occupational disease has the physical capability to perform sedentary work. The evidence presented by the employers [7] in *City of Philadelphia* did not challenge the fact that the employees suffered from irreversible occupational diseases, but pertained only to a general change in physical condition that supported the claim that the employees could perform sedentary work. Here, Employer, through the testimony of Drs. Bush and Oesterling, has challenged the fact that Decedent suffered from an irreversible occupational disease.

## IV.

Employer next argues that the WCJ's second decision is neither supported by substantial evidence nor reasoned as required by the Act. In making this argument, Employer once again raises its previous, and meritless, argument that the WCJ failed to make findings of fact establishing that the testimony of Drs. Bush and Oesterling denied that Decedent suffered from coal workers' pneumoconiosis. Employer also argues that the testimony of Drs. Wecht and Goldblatt failed to state precisely how Decedent's coal workers' pneumoconiosis contributed to his death. A review of the record, very briefly distilled in the factual summary set forth earlier in this opinion, reveals that this argument is also without merit. *See* Deposition of Dr. Wecht, pp. 20–25; Deposition of Dr. Goldblatt, pp. 23–26.

Finally, Employer argues that the WCJ's second decision is not reasoned because it allegedly failed to consider all of the medical evidence as indicated by the WCJ's adoption of his previous decision but without the inclusion of his previous Finding of Fact No. 9. This finding had discussed the medical evidence of the wit-

---

7. *City of Philadelphia* involved two consoli-   dated cases.

nesses and set forth the WCJ's initial finding that coal workers' pneumoconiosis played no role in Decedent's death. The WCJ, however, fully set forth a summary of the medical testimony of Drs. Wecht and Goldblatt in the first decision's Findings of Fact Nos. 5 and 6, consisting of more than four pages, and these findings were incorporated in the second decision. Therefore, Employer's argument is again incorrect. Finally, in Finding of Fact No. 7 of the second decision, the WCJ discusses why he found the testimony of Drs. Wecht and Goldblatt credible and persuasive, emphasizing their expertise and also the fact that Dr. Wecht's office had performed the autopsy.

For the above reasons, the Board's order is affirmed.

### ORDER

AND NOW, this 7th day of October, 2004, the order of the Workers' Compensation Appeal Board in the above-captioned matter is hereby affirmed.